J. S27001/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.D.C., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.C., FATHER, | : | |
| | : | No. 3208 EDA 2014 |
| Appellant | : | |

Appeal from the Decree, October 10, 2014,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000223-2012,
CP-51-DP-0055445-2010

| | | |
|---|---|---|
| IN THE INTEREST OF: Y.L.C., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.C., FATHER, | : | |
| | : | No. 3214 EDA 2014 |
| Appellant | : | |

Appeal from the Decree, October 10, 2014,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000224-2012,
CP-51-DP-0055446-2010

| | | |
|---|---|---|
| IN THE INTEREST OF: K.M.C.C., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.C., FATHER, | : | |
| | : | No. 3215 EDA 2014 |
| Appellant | : | |

Appeal from the Decree, October 10, 2014,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000225-2012,
CP-51-DP-0055447-2010

J. S27001/15

IN THE INTEREST OF: H.E.A.D.C.,   :    IN THE SUPERIOR COURT OF
A MINOR                      :           PENNSYLVANIA
                                    :
APPEAL OF: S.C., FATHER,         :
                                    :           No. 3216 EDA 2014
               Appellant    :

Appeal from the Decree, October 10, 2014,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000226-2012,
CP-51-DP-0055448-2010

IN THE INTEREST OF: S.W.C., JR.,   :    IN THE SUPERIOR COURT OF
A MINOR                      :           PENNSYLVANIA
                                      :
APPEAL OF: S.C., FATHER,         :
                                    :           No. 3217 EDA 2014
               Appellant    :

Appeal from the Decree, October 10, 2014,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000643-2012,
CP-51-DP-0055444-2010

BEFORE: FORD ELLIOTT, P.J.E., STABILE AND FITZGERALD,[*] JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:         **FILED MAY 11, 2015**

In these consolidated cases, S.C. ("Father") appeals the October 10, 2014 decrees that terminated his parental rights to five of his eight children with Y.C. ("Mother"):[1] H.E.A.D.C. (male), K.M.C.C. (male), Y.L.C. (female),

---

[*] Former Justice specially assigned to the Superior Court.

[1] Mother has filed a separate appeal from the termination orders, docketed at Nos. 3354, 3355, 3356, 3357, and 3358 EDA 2014.

- 2 -

J.D.C. (female), and S.W.C., Jr. (male), (collectively "the Children"), who at the time of the termination hearing were ages four, nine, twelve, thirteen, and fourteen, respectively, and had been in foster care for approximately four years. Mother and Father's three oldest children, Do.L.C. (female), Jaz.C (female), and Du.C (male), ages 16, 17, and 18, are all under the Department of Human Services' ("DHS") supervision, but are not subject to the current termination petitions. After careful review, we affirm.

DHS became involved with the Children in May 2010 following numerous calls to DHS' hotline that the Children were coming to school dirty and hungry, that the Children's home was cluttered and disorganized, that Do.L.C. was not attending school, and that Father had hit Y.L.C. At the time, the Children were living with Mother; Father was not a custodial caregiver. (Notes of testimony, 4/22/10 at 24.)

Dependency petitions were filed on May 24, 2010, and granted on June 10, 2010. Initially, the Children remained in Mother's custody. However, the Children were placed in foster care in November 2010. Father's home was explored as a placement resource, but because Father's live-in girlfriend had an "indicated child abuse" report against her and Father was unwilling to live apart from her, the Children could not be placed with him. (*Id.* at 33-34.)

On November 21, 2011, as the result of sexual abuse allegations made by Jaz.C and Sha.C, Father's biological daughter from another mother, as

well as physical abuse allegations by all the Children, the trial court issued a stay away order barring Father from having contact with the Children. In December 2011, Father was arrested for the sexual abuse allegations. DHS filed petitions for goal change to adoption and involuntary termination of parental rights as to the four youngest children, H.E.A.D.C., K.M.C.C., Y.L.C., and J.D.C. on May 24, 2012. On December 21, 2012, a petition was filed as to S.W.C., Jr.

In July 2013, Father was convicted of indecent assault of Sha.C. for acts beginning in 2009 when Sha.C. was eight years old. Father was sentenced to lifetime registration as a sexually violent predator on the Megan's Law registry, 9 to 23 months' incarceration, and five years' probation.

There were nine permanency review hearings between 2010 and 2014. Father attended only one FSP meeting shortly after the Children's placement. Father's FSP objectives were to: (1) maintain employment; (2) complete a mental health evaluation, and comply with all treatment recommendations; (3) maintain regular visitation with the Children; (4) locate and occupy suitable housing for the family; and (5) participate in parenting education to learn non-violent, non-physical, non-threatening discipline methods to resolve family conflicts. Father was found to be non-compliant with his FSP objectives at four hearings, minimally compliant at two hearings, and moderately compliant at one. On January 21, 2014,

the last hearing before the termination proceedings began, the trial court found Father had not participated in mental health counseling and parenting classes.

Hearings were held on the termination petitions on April 22, 2014 and October 10, 2014.[2] DHS presented five witnesses: Henry Bullock, the original DHS worker assigned to the case from April 2010 to November 2010; Bianca Lahara, the first case manager assigned to the case from November 2010 to January 2014; Latoya Carr-Hermitt, case manager assigned to the case from December 2010 through the October 10, 2014 termination hearing; Ms. Griffin[3] of First Home Care, current case manager; Antoinette Bogan, First Home Care Social Worker, assigned to the case in July 2014 to present. Father testified on his own behalf and also called a representative from CASA as well as a CASA volunteer, both of whom worked with S.W.C., Jr.

At the close of the October 10th hearing, Judge Tereshko terminated Father's parental rights to the Children in accordance with 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), and changed their permanency goals to

---

[2] A partial termination hearing took place in 2013 before the Honorable E. Wright. Due to time constraints, the remainder of the hearing was continued. Before the remainder of the case could be heard, Judge Wright recused himself on September 25, 2013, following an **ex parte** communication of Mother's former counsel to the court. The case was reassigned to the Honorable Allen Tereshko, who ordered the termination proceedings start again **de novo**.

[3] Ms. Griffin's first name was inaudible when she testified.

adoption. Father filed timely notices of appeal along with Pa.R.A.P. 1925(b)

statements. The trial court filed a Rule 1925(a) opinion on December 10,

2014.

Father raises two issues for our consideration:

1. Did the juvenile court err by relying on facts that were not introduced into evidence?

2. Did the juvenile court err in determining that it was in the best interest of the child[ren] to terminate Father's parental rights as Father had a bond with his children?

Father's brief at 5.

We review the termination of parental rights in accordance with the

following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *In re: R.I.S.*, 36 A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.* [] Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> . . . . [E]ven where the facts could support an opposite result, as is often the case in dependency

and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judge[] so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-827 (Pa. 2012) (citations modified, some citations omitted). It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds by clear and convincing evidence, a standard that requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re T.F.***, 847 A.2d 738, 742 (Pa.Super. 2004) (citation omitted).

This court has explained the proper analysis for a termination petition, as follows:

[U]nder Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only after determining that the parent's conduct warrants termination of his or her parental rights must the court engage in the second part of the analysis: [the] determination of the needs and welfare of the child under the standard of best interests of the child. Although a needs and welfare analysis is mandated by the statute, it is distinct from and not relevant to a determination of whether the parent's conduct justifies termination of parental rights under

> the statute. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child.

*In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa.Super. 2008) (*en banc*).

In his first issue, Father argues the trial court erred when it relied on extrajudicial facts to render its decision. Specifically, Father complains the trial court relied on 46 statements of fact that were listed in Exhibit A that was attached to DHS's petition for termination of parental rights. In the trial court's opinion under the section "Findings of Fact," the court referenced these 46 statements of fact obtained from Exhibit A. According to Father, the trial court opinion continually cites information that was not in evidence and was only referenced in Exhibit A.

We have reviewed the record in this matter and disagree with Father's assertion that none of the 46 factual findings was introduced by way of testimony nor appears in any of the DHS exhibits that were introduced at the hearings. In fact, many of the factual findings were introduced at the April 22, 2014 and October 10, 2014 hearings. However, even if it were improper for the trial court to cite to Exhibit A of DHS's petition instead of the evidence adduced during the hearings as support for its factual findings, the error is harmless. The trial court cites to Exhibit A only in the section of the opinion providing the procedural history and background information. (*See* trial court opinion, 12/10/14 at 2-11.) The "Legal Analysis" section of

the trial court's opinion sets out a thorough review of the case with citations to the evidence presented at the termination hearings and does not cite to Exhibit A.  (*Id.* at 12-15.)  *See In re Adoption of S.P.*, 47 A.3d at 827 (finding no error where even though the Superior Court improperly highlighted aspects of the record not addressed by the trial court, the Superior Court did not base its conclusions on those facts).

We observe that Father has only raised the "extrajudicial facts" issue; he does not challenge the sufficiency of the evidence to support the trial court's decision to terminate his parental rights under Section 2511(a)(1), (2), (5), and (8).  Accordingly, the arguments made in Father's Rule 1925(b) statement regarding the sufficiency of the evidence under Section 2511(a) have been abandoned on appeal and are, thus, waived.  *See In re K.K.*, 957 A.2d 298, 303 (Pa.Super. 2008) (an appellant abandons an issue by not addressing it in the argument section of the brief), citing *In re Jacobs*, 936 A.2d 1156, 1167 (Pa.Super. 2007) (finding issue waived because appellant did not address it in argument section of appellate brief).

Even if we assume Father has not waived a challenge to the sufficiency of the evidence to support termination under Section 2511(a), we believe the record contains enough evidence to support the termination of Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2).  In order to terminate parental rights pursuant to Section 2511(a)(2), three elements must be met:   (1) repeated and continued incapacity, abuse, neglect, or refusal;

(2) such incapacity, abuse, neglect, or refusal caused the child to be without essential parental care, control, or subsistence; and (3) the causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citations omitted).

Our supreme court has explained our inquiry under Section 2511(a)(2) as follows:

> As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." If and only if grounds for termination are established under subsection (a), does a court consider "the developmental, physical and emotional needs and welfare of the child" under § 2511(b).
>
> This Court has addressed incapacity sufficient for termination under § 2511(a)(2):
>
> > A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

***In re Adoption of S.P.***, 47 A.3d at 827 (Pa. 2012) (citation omitted).

Instantly, Father is a convicted sex offender. Father failed to obtain a mental health evaluation even though he was ordered to do so. Given Father's sexually violent predator status, such an evaluation and treatment were critical steps needed to assess Father's ability to safely parent, and to assess his capacity to form and maintain relationships with the Children. ***See In re B.C.***, 36 A.3d 601, 610 (Pa.Super. 2012) (affirming termination where father's mental and emotional issues, which require anger management and sexual offender treatment, remained unaddressed at the time of the termination hearing).

Evidence was presented that the Children were afraid of Father due to a history of physical abuse involving his disciplinary practices. Father was referred to the Achieving Reunification Center ("ARC") for services to assist him in meeting his FSP goals; such as, parenting education to learn non-violent discipline methods. However, Father never attended. Additionally, Father remained unemployed.

According to DHS, the agency continued to send all correspondence to Father, but Father never reached out to take advantage of the services offered to him. While Father was incarcerated, DHS sent him updated information about the Children. Father made no effort to maintain any parent-child relationship while he was incarcerated. A parent's incarceration does not preclude termination of parental rights if the incarcerated parent

fails to utilize given resources and to take affirmative steps to support a parent-child relationship. *In re D.J.S.*, 737 A.2d 283 (Pa.Super. 1999). Nor does incarceration toll parental responsibilities. *Adoption of McCray*, 331 A.2d 652, 654 (Pa. 1975).

We also observe that even though there was a no-contact order in place while the Children were in foster care, Father made no effort to inquire as to their well-being, nor did he take part in any FSP meeting or permanency review hearings. *See In re V.E.,* 611 A.2d 1267, 1273 (Pa.Super. 1992) (affirming termination under Section 2511(a)(2) where father, incarcerated for sexually abusing his children, made no effort to contact child welfare agency about his children).

Based on the above, the clear and convincing evidence of record confirms the trial court's determination that Father did not remedy the conditions that caused the Children to come into care; and that Father has been, and continues to be, unable to provide proper care for the Children, warranting the involuntary termination of his parental rights pursuant to Section 2511(a)(2).

In his final issue, Father contends the trial court erred in determining that it was in the best interest of the Children to terminate his parental rights. According to Father, the testimony presented showed that he did have a relationship with the Children; the most obvious was with S.W.C., Jr.

(Father's brief at 21.)   Additionally, Father alleges the trial court never addressed the bond between him and the Children.  (**Id.** at 22.)

We turn to Section 2511(b) which provides:

### § 2511.  Grounds for involuntary termination

**(b)  Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

In reviewing the evidence in support of termination under Section 2511(b), we consider whether the termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child.   **See In re C.M.S.**, 884 A.2d 1284, 1286-1287 (Pa.Super. 2005).  "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child."  **Id.** at 1287 (citation omitted).  The court must also discern the nature and status of the parent/child bond, with utmost attention to the effect on the child from permanently severing that bond.  **See id.**  This court has observed that

no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond is attenuated. *See In re K.Z.S.*, 946 A.2d 753, 764 (Pa.Super. 2008).

In reaching its decision that there was not a strong bond between Father and the Children, the trial court relied on the testimony of Latoya Carr-Hermitt, who had the opportunity to see the Children in their respective placements. She testified as follows:

> Q. And as far as [H.E.A.D.C.] is concerned how frequently do you visit [H.E.A.D.C.]?
>
> [Ms. Carr-Hermitt]: Every month since he's under five.
>
> Q. And what can you tell the Court about which [sic] you've seen as far as [H.E.A.D.C.'s] relationship with his foster parents?
>
> A. He has a great relationship with his foster family. He calls his foster mom, mom. Especially his foster father. They do a lot of building, a lot of skills, a lot of outdoor stuff. He does call him dad. A lot of interaction, and he says that he loves to be around them.
>
> Q. And as far as [J.D.C.] is concerned, how frequently do you visit her in the home of the West's (sic)?
>
> A. Every three months.
>
> Q. And during the visits you made to [J.D.C.] (inaudible) what can you tell the Court about what you've seen as far as her interactions with her foster parents?

A.     She's bonded to her foster mother [and] foster father.  She likes the environment that she's in.  They do a lot of activities together.  She really enjoys being there.

Q.     And as far as [Y.L.C.] is concerned, I believe she's placed with Mr. Frazier?

A.     Miss Mack.

Q.     Miss Mack, I'm sorry.  How frequently have you seen [Y.L.C.] in Miss Mack's home?

A.     About the same three months.

Q.     And what can you tell the Court about what you've seen as far as her interactions?

A.     Miss Mack has been phenomenal for [Y.L.C.] in terms of helping with her behavioral issues in school, in terms of giving her consistencies, in terms of making sure that the needs of the child [are] met, that she has structure, and [Y.L.C.] really loves it at Miss Mack's home and she wants to stay there.

Q.     And has [Y.L.C.] ever expressed any interest in adoption, if you know?

A.     Yes.

Q.     To you?

A.     Yes.

Q.     And has [J.D.C.] expressed any interest in adoption?

A.     Yes.

Q.     To you?

A.     Yes.

Q.     Has [S.W.C., Jr.], ever expressed any interest in adoption to you?

A.     Yes.

Q.     And can you explain why it is that you believe it would be in [S.W.C., Jr's] best interest for the Court to accept the goal of adoption?

A.     For the majority of this case, I think [S.W.C., Jr.] has been the outcaste [sic] to say, he's had the least contact with either one of his parents even when he was at Silver Springs. Visitation was offered. Mom never went to see him. Father didn't go to see him. [He] just hasn't had any contact with his family and (inaudible) supportive system, but the institution has been his family.

Q.     Okay. As far as [K.M.C.C.] is concerned why do you believe the goal of adoption would promote [K.M.C.C.'s] interest?

A.     [K.M.C.C.] is doing very well in his foster home, he started to strive academically. He was behind when he first came into care since he's been with Mr. Lalli (sic), he's been doing very well, he's been open[ing] up, he's been talking more in therapy about things that happened to him at JJPI. So I think that he's starting to develop a healthy relationship and trust based off the environment that he's in.

Notes of testimony, 4/22/14 at 69-71.

Additionally, Ms. Carr-Hermitt testified there was a stay away order against Father regarding all the Children. (*Id.* at 82.) The basis for the order was the Children's fear of physical abuse by Father, as well as the allegations of sexual abuse. (*Id.* at 83.) The Children also feared Father's disciplinary practices. (*Id.*) The trial court concluded "there was not a

- 16 -

strong bond between Father and his children." (Trial court opinion, 12/10/14 at 13.)

In his brief, Father singles out S.W.C., Jr., and attempts to persuade this court that he has a connection with this child. Father also claims that by terminating his parental rights, we are effectively making S.W.C., Jr., an orphan because an identifiable adoption resource has not been found. (Father's brief at 21-22.)

We note that the Adoption Act provides that a pending adoption is not necessary to the termination of parental rights by an agency such as DHS. **See** 23 Pa.C.S.A. § 2512(b) ("If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists."). The Pennsylvania Supreme Court has observed that termination can remove the impediment to a child's ability to attach to a pre-adoptive family caused by a lingering bond with a parent who has proven incapable of meeting the child's needs for care and stability. **See In re T.S.M.**, 71 A.3d 251, 271 (Pa. 2013) (finding it was in the best interest of the children to sever unhealthy bond with Mother in order to permit them to form healthy attachments with families who could provide permanent homes).

At the time of his placement, S.W.C., Jr., was ten years old. He was placed in an institutional residential treatment facility. As previously stated, Ms. Carr-Hermitt testified that neither parent visited him even though

visitation was offered. (Notes of testimony, 4/22/14 at 71.) She referred to him as "the outcast." *Id.* Ms. Carr-Hermitt further testified that given his lack of contact with his family, "the institution has been his family." *Id.* Four years after his placement and with termination petitions filed, Father began to visit him in 2014.

Trish Kinkle, one of Father's witnesses and a CASA supervisor, testified that Father brings games with him when he visits S.W.C., Jr., and they have a good time. (Notes of testimony, 10/10/14 at 83.) However, she also testified that she has never observed the visits. (*Id.* at 84.)

Father's other witness, Patricia McKinney, a court-appointed CASA volunteer, testified she has known S.W.C., Jr., for four years and that the visits with Father were going well. (*Id.* at 86, 93.) However, she stated she believes that termination of Father's parental rights would be best for him because he needs the safety and stability of a permanent home. (*Id.* at 92-93.)

The fact that Father now visits <u>one</u> of his children, plays games, and has a good time is a far cry from fulfilling his parental role. Clearly, Father is not providing for any of his Children's emotional, physical, and developmental needs. The Children look to their foster parents for love, comfort, and security. There was no evidence that termination of Father's parental rights would affect them negatively. S.W.C., Jr., the only child out of the five who is not in a pre-adoptive home, told DHS he wants Father's

parental rights terminated so that he could have a chance to be adopted by a family that would "be there for him consistently and love him all the time." (***Id.*** at 44.)

Based on the above, the trial court did not abuse its discretion in terminating Father's parental rights.

Decrees affirmed.

Stabile, J. joins the Memorandum.

Fitzgerald, J. concurs in the result.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/2015